FILED: 09/25/2015

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NICKOLUS BLEVINS, individually and
on behalf of all others similarly situated,   )   **Class Action**
                                                      )
         Plaintiffs,   )   CASE NO. CV 15-04019 MMM (MRWx)
                                                      )
        vs.   )   ORDER GRANTING PLAINTIFF'S
                                                      )   MOTION TO REMAND
REPUBLIC REFRIGERATION, INC.,   )
                                                      )
        Defendant.   )
                                                      )
                                                      )
                                                      )

       On April 27, 2015, Nickolus Blevins filed this class action against Republic Refrigeration, Inc. ("Republic") and various fictitious defendants in Los Angeles Superior Court.[1] He served the summons and complaint on Republic on April 28, 2015. Republic answered Blevins' complaint on May 27, 2015,[2] and the following day, removed the action to federal court. Blevins pleads six causes of action for failure to provide meal and rest breaks under California Labor Code §§ 226.7 and 512; failure to pay

_____

[1] Notice of Removal of Action to Federal Court ("Notice of Removal"), Docket No. 1 (May 28, 2015), Exh. A ("Complaint").

[2] Notice of Removal, Exh. C ("Answer").

minimum and overtime wages under Labor Code §§ 510 and 1194; waiting time penalties under Labor Code § 203; failure to keep appropriate records under Labor Code §226; failure to compensate employees for business expenses under Labor Code § 2802; and a Private Attorneys General Act ("PAGA") claim under Labor Code § 2698 *et seq.*[3]  Blevins also pleads a claim for unfair competition in violation of Business & Professions Code § 17200 *et seq.*[4]

On June 26, 2015, Blevins filed a motion to remand.[5]  Republic opposed the motion on August 31, 2015.[6]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds the motion appropriate for decision without oral argument. The hearing calendared for September 28, 2015 is therefore vacated, and the matter taken off calendar.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Blevins was an employee of Republic from December 26, 2014 to January 13, 2015; he worked as a skilled helper and was paid on an hourly basis.[7]  Republic is a commercial refrigeration construction firm that serves customers throughout California.[8]  Blevins alleges that Republic, together with the fictitious defendants, engaged in "systemic illegal employment" by failing to compensate its employees adequately.[9]  Blevins asserts that his employment fell within PAGA's scope, and that he is entitled to recover civil penalties as an "aggrieved employee."[10]

Blevins contends that defendants acted "intentionally and with deliberate indifference and

---

[3]Complaint, ¶¶ 33-77.

[4]*Id.*, ¶¶ 78-83.

[5]Motion to Remand ("Motion"), Docket No. 12 (June 26, 2015).

[6]Memorandum in Opposition to Notice of Motion and Motion to Remand ("Opposition"), Docket No. 20 (Aug 31, 2015).

[7]Complaint, ¶ 9.

[8]*Id.*, ¶ 10.

[9]*Id.*, ¶¶ 2-3.

[10]*Id.*, ¶ 26.

conscious disregard to the rights of all employees [by] (1) failing to pay all meal period wages and rest break wages, (2) failing to pay all minimum and overtime wages, (3) failing to pay all wages due and owing upon termination of employment, (4) failing to provide accurate wage statements, (5) failing to provide reimbursement for business expenses and (6) engaging in unfair business practices."[11]  Blevins alleges that these violations were committed pursuant to "a corporate policy, practice and/or procedure" that was "uniformly administered," and that they were "accomplished with the advance knowledge and designed with intent to willfully withhold appropriate wages for work performed by members of the Class."[12]

Plaintiff seeks to represent a class of "all current and former non-exempt employees of Defendants who worked in California and were paid on an hourly basis from April 29, 2011 to the present."[13]  The complaint also alleges the following subclasses: (1) a meal period subclass, (2) a rest break subclass, (3) an overtime subclass, (4) a minimum wage subclass, (5) a terminated employees subclass, (6) a wage statement subclass, and (7) a business reimbursement subclass.[14]

In its notice of removal, Republic contends that removal is proper under the Class Actin Fairness Act ("CAFA") because the amount in controversy exceeds $5,000,000, and the citizenship of the parties is minimally diverse.[15]  Republic asserts that it is incorporated and has its principal place of business in North Carolina.[16]  It contends Blevins is a California citizen.[17]      The notice

---

[11]*Id.*, ¶¶ 2-3.

[12]*Id.*, ¶ 17.

[13]*Id.*, ¶ 14.

[14]*Id.*

[15]Notice of Removal, ¶ 9.

[16]*Id.*, ¶ 13.

[17]*Id.*, ¶ 12.

of removal is accompanied by the declaration of Austin Lowe,[18] Republic's Assistant Controller.[19] He states that in his position, he has become familiar with the company's corporate structure and its executive, administrative, financial and management functions.[20]  He states he has "knowledge of and access to the employment-related files kept by Republic . . . in the regular and ordinary course of business including, but not limited to, personnel files of [its] current and former employees. . . ."[21] He also reports that he "regularly review[s], and thus [is] familiar with, Republic['s] . . . human resource and employment-related policies and procedures."[22]  Lowe states that there are 201 putative class members and that the average hourly rate of pay for the class was $21.30.[23]

Blevins does not dispute the fact that the parties' citizenship is minimally diverse or that there are more than 100 putative class members.  Rather, he contends that Republic has failed to prove by a preponderance of the evidence that the amount in controversy exceeds $5,000,000.

## II.  DISCUSSION

### A.    Legal Standard Governing Removal Jurisdiction

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).  "If at any time before final judgment, it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).

---

[18]Declaration of Austin Lowe ("Lowe Decl."), Docket No. 1-6 (May 28, 2015).

[19]*Id.*, ¶ 2.

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]*Id.*, ¶ 6.

The right to remove a case to federal court is entirely a creature of statute.  See *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979).  The removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states and involves an amount in controversy that exceeds $75,000.  See 28 U.S.C. §§ 1441(a), (b); see also 28 U.S.C. §§ 1331, 1332(a).  Only state court actions that could originally have been filed in federal court can be removed.  28 U.S.C. § 1441(a); see *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988).

## B. Legal Standard Governing CAFA Jurisdiction

In 2005, Congress enacted the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4.  CAFA gives district courts original jurisdiction to hear class actions "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and "in which[, *inter alia*,] any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2); see also *Luthis v. Countrywide Homes Loans Servicing LP*, 533 F.3d 1031, 1033-34 (9th Cir. 2008) ("The Class Action Fairness Act of 2005 § 4(a), 28 U.S.C. § 1332(d)(2), amended the requirements for diversity jurisdiction by granting district courts original jurisdiction over class actions exceeding $5,000,000 in controversy where [the citizenship of] at least one plaintiff is diverse from at least one defendant.  In other words, complete diversity is not required.  CAFA also provided for such class actions to be removable to federal court.  See 28 U.S.C. § 1453(b).

Under CAFA, the number of members of all proposed classes must exceed 100 in the aggregate. 28 U.S.C. § 1332(d)(5)(B). See also *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020-21 (9th Cir. 2007) ("As a threshold matter, CAFA applies to 'class action' lawsuits where the aggregate number of members of all proposed plaintiff classes is 100 or more persons and where the primary defendants are not 'States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief.' § 1332(d)(5). . . .  Once the prerequisites of § 1332(d)(5) are satisfied, CAFA vests federal courts with 'original' diversity jurisdiction over class

actions if (1) the aggregate amount in controversy exceeds $5,000,000, and (2) any class member is a citizen of a state different from any defendant.  § 1332(d)(2)"); *id.* at 1021 n. 3 ("The Fifth Circuit characterized § 1332(d)(5) as an 'exception' to CAFA jurisdiction conferred under § 1332(d)(2). . . . We view § 1332(d)(5) somewhat differently. . . .  [S]atisfaction of § 1332(d)(5) serves as a prerequisite, rather than as an exception, to jurisdiction under § 1332(d)(2).  This distinction is important because, as we address later, there are 'exceptions' to the statute in which jurisdiction otherwise exists under § 1332(d)(2) but the federal courts either *may* or *must* decline to exercise that jurisdiction.  See, e.g., § 1332(d)(3)-(4)").

"Congress enacted CAFA . . . to 'curb perceived abuses of the class action device which, in the view of CAFA's proponents, had often been used to litigate multistate or even national class actions in state courts.'"  *Corber v. Xanodyne Pharmaceuticals, Inc.*, 771 F.3d 1218, 1222 (9th Cir. 2014) (quoting *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 (9th Cir. 2009)).  See also *Bridewell-Sledge v. Blue Cross of California*, _ F.3d _, 2015 WL 4939641, *4 (9th Cir. Aug. 20, 2015).  CAFA was enacted, in part, to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction."  Pub.L. No. 109-2, § 2(b)(2), 119 Stat. at 5 (codified as a note to 28 U.S.C. § 1711).  See also *Jordan v. Nationstar Mortgage LLC*, 781 F.3d 1178, 1183-84 (9th Cir. 2015) ("Th[e Supreme Court's statement that no antiremoval presumption applies in CAFA cases] is bolstered by the Court's reference to Congress's overall intent . . . to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications" (internal quotation marks omitted)); *id.* at 1182 ("The Senate Report on CAFA explains that '[b]ecause interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit, the Committee firmly believes that such cases properly belong in federal court,'" quoting S. Rep. No. 109-14, at 5, 2005 U.S.C.C.A.N. 3, 6); *Standard Fire Ins. Co v. Knowles*, 133 S. Ct. 1345, 1350 ("CAFA's primary objective is to ensure Federal court consideration of interstate cases of national importance" (internal quotation marks omitted)).

As a result, "CAFA's provisions should be read broadly, with a strong preference that

1  interstate class actions should be heard in a federal court if properly removed by any defendant."

2  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014) (quoting S. Rep. No.

3  109-14, at 43).

4  ## C.    Legal Standards and Procedure Governing CAFA Removals

5  The Supreme Court has made clear that "no antiremoval presumption attends cases invoking

6  CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."

7  *Dart Cherokee*, 135 S. Ct. at 554.  See also *Jordan*, 781 F.3d at 1183.

8  "[A] defendant seeking to remove a case to a federal court must file in the federal forum a

9  notice of removal 'containing a short and plain statement of the grounds for removal.'  By design,

10  § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil

11  Procedure.  The legislative history of § 1446(a) is corroborative.  Congress, by borrowing the

12  familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the pleading

13  requirements for removal' and to clarify that courts should 'apply the same liberal rules [to removal

14  allegations] that are applied to other matters of pleading.'"  *Dart Cherokee*, 135 S. Ct. at 553

15  (quoting § 1446(a); H.R. Rep. No. 100-889, p. 71 (1988)).  See also *Johnson v. Sunrise Sr. Living*

16  *Mgmt., Inc.*, No. CV 15-02297 BRO (VBKx), 2015 WL 3830291, *4 (C.D. Cal. June 18, 2015) ("To

17  meet the amount-in-controversy requirement under CAFA, a removing defendant must plausibly

18  assert that the amount in controversy exceeds $5,000,000.  All this requires is a 'short and plain

19  statement' of the grounds for removal.  This language tracks that of Federal Rule of Civil Procedure

20  8(a), and courts have been instructed to apply this same liberal pleading standard in cases of removal

21  involving CAFA," citing 28 U.S.C. § 1446; *Dart Cherokee*, 135. S. Ct. at 553).

22  Where the amount in controversy is not disputed, a defendant is not required to adduce

23  evidence establishing the amount; the amount the defendant alleges should generally be accepted

24  if the allegation appears to have been made in good faith. *Johnson*, 2015 WL 3830291 at *4.  See

25  also *Dart Cherokee*, 135 S. Ct. at 553 ("[W]hen a defendant seeks federal-court adjudication, the

26  defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff

27  or questioned by the court"); H.R. Rep. No. 112-10, p. 16 (2011) ("[D]efendants do not need to

28

1    prove to a legal certainty that the amount in controversy requirement has been met.  Rather,

2    defendants may simply allege or assert that the jurisdictional threshold has been met.  Discovery may

3    be taken with regard to that question.  In case of a dispute, the district court must make findings of

4    jurisdictional fact to which the preponderance standard applies").

5           Where "the plaintiff contests, or the court questions, the defendant's allegation" in its notice

6    of removal, however, further evidence establishing that the amount in controversy meets the

7    jurisdictional threshold is required.  *Johnson*, 2015 WL 3830291 at *4.  See also *Dart Cherokee*, 135

8    S. Ct. at 550 ("If the plaintiff contests the defendant's allegation . . . both sides submit proof and the

9    court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement

10   has been satisfied").

11          "Thus, in considering Plaintiff's motion to remand, the Court must determine, 'by a

12   preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.'"

13   *Johnson*, 2015 WL 3830291 at *4 (quoting *Dart Cherokee*, 135. S.Ct. at 554).  "To satisfy the

14   burden [of] demonstrat[ing] [that] the amount in controversy [requirement is met], defendant[] may

15   rely upon facts presented in the removal petition as well as any 'summary-judgment-type evidence

16   relevant to the amount in controversy at the time of removal.'"  *Lafountain v. Meridian Senior*

17   *Living, LLC*, No. CV 15-03297 RGK (PJWx), 2015 WL 3948842, *2 (C.D. Cal. June 29, 2015)

18   (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir.1997)).  See also

19   *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)("The parties may submit

20   evidence outside the complaint, including affidavits or declarations, or other

21   'summary-judgment-type evidence relevant to the amount in controversy at the time of removal,'"

22   quoting *Singer*, 116 F.3d at 377).

23          "While the Ninth Circuit held that both parties are entitled to submit summary-judgment-style

24   evidence regarding the propriety of removal, [*Ibarra*] declined to decide whether a plaintiff was

25   required to submit evidence refuting the defendant's allegations and evidence of the amount in

26   controversy in order to prevail on a motion to remand."  *Unutoa v. Interstate Hotels & Resorts, Inc.*,

27   No. 2:14-CV-09809 SVW (PJWx), 2015 WL 898512, *2 (C.D. Cal. Mar. 3, 2015); see *Ibarra*, 775

28   F.3d at 1199-200 ("Manheim contends that plaintiffs cannot 'simply say nothing and offer no

evidence of amount in controversy at all.'  Plaintiffs contend, on the other hand, that plaintiffs' motion to remand need not include evidence and is allowed to 'be based on the fact that Defendant's evidence is insufficient to meet the burden of proof,' and that requiring plaintiffs to submit evidence first 'would fundamentally switch to plaintiffs the burden of defeating subject-matter jurisdiction.' The Supreme Court did not decide the procedure for each side to submit proof on remand, and here we need not decide the procedural issue, either. Rather, we remand with instructions to the district court to consider the parties' briefs on this issue and set a reasonable procedure in the first instance so that each side has a fair opportunity to submit proof").  See also *Duberry v. J. Crew Group, Inc.*, No. CV 14C-08810 SVW (MRWx), 2015 WL 4575018, *2 (C.D. Cal. July 28, 2015) ("For example, although both parties may submit summary-judgment-style evidence, it is unclear whether a plaintiff must submit affirmative evidence to prevail on a motion to remand"); *Erick Lina v. Barnes & Noble, Inc.*, CV 15-00281-GHK (CWx), *4-5 (C.D. Cal. Apr. 1, 2015) ("Defendants claim that the *Dart Cherokee* Court's use of the phrase 'both sides submit proof' means that both sides must submit proof of the amount of controversy now, but the Ninth Circuit has made clear that this remains an open question").

A number of district courts considering the question have held, however, that a plaintiff need only "come forward with contrary evidence when the removing defendant has produced evidence to meet its initial burden."  *Rosales v. Staples Contract & Commercial, Inc.*, No. EDCV15-00949 JFW (DTBx), 2015 WL 4537577, *2 (C.D. Cal. July 27, 2015).  See, e.g., *Varsam v. Lab. Corp. of Am.*, No. 14cv2719 BTM JMA, 2015 WL 4199287, *2 (S.D. Cal. July 13, 2015) ("The plaintiff is not required to submit evidence refuting the defendant's allegations and evidence of the amount in controversy in order to prevail on its motion to remand"); *Townsend v. Brinderson Corp.*, No. CV 14-05320 FMO (RZx), 2015 WL 3970172, *3 (C.D. Cal. June 30, 2015) ("The court reads those decisions as requiring a plaintiff to come forward with contrary evidence only when the removing defendant has first come forward with sufficient evidence to meet its initial burden.  Once defendant has done so, then the burden shifts to plaintiff to produce evidence.  In other words, while plaintiff may rebut defendant's evidence with his own evidence, he or she need not do so in order to prevail on his or her motion for remand" (internal citations omitted)); *Mejia v. DHL Express (USA), Inc.*,

1   No. CV 15-00890-GHK (JCx), 2015 WL 2452755, *2 (C.D. Cal. May 21, 2015) ("While Plaintiff

2   may rebut Defendant's evidence with his own evidence, he need not do so in order to prevail in his

3   Motion"); see also *Ibarra*, 775 F.3d at 1197 (a "defendant in a jurisdictional dispute has the burden

4   to put forward evidence showing that the amount in controversy exceeds $5 million . . . and to

5   persuade the court that the estimate of damages in controversy is a reasonable one"); *id*. at 1199

6   ("[Defendant], as the removing [party], has the burden of proof on this").  The court agrees that the

7   burden of adducing evidence rests with defendant and that plaintiff need not proffer evidence until

8   defendant has proffered sufficient proof to meet its initial burden.

9        **C.**    **Whether the Court Should Remand the Action to Los Angeles Superior Court**

10        In its notice of removal, Republic calculates that the amount in controversy exceeds

11   $5,000,000 in two alternative ways.  First, citing the number of class members, their average hourly

12   pay, and allegations concerning violation frequency, it asserts that the amount in controversy is

13   $6,111,200.25.[24]  Alternately, Republic argues that Blevin alleges the amount in controversy on his

14   individual claims exceeds $25,000, and that that number can be multiplied by 201 class members

15   for a total amount in controversy of $5,025,000.[25]  Blevins counters that Republic cannot satisfy its

16   burden of proof using either approach.

---

27   [24]Notice of Removal, ¶¶ 20-25.

28   [25]*Id.*, ¶ 26.

     **1.**     **Whether Republic Has Satisfied Its Burden of Calculating Violation Frequency**

Republic argues that the amount in controversy is $6,111,200.25, given that there are 201 individuals in the class with an average rate of pay of $21.40, and given its assumptions concerning violation frequency based on the allegations in the complaint. Blevins argues that Republic's assumptions are nothing more than speculation and conjecture.

"[T]he proper burden of proof imposed upon a defendant to establish the amount in controversy is the preponderance of the evidence standard." *Rodriguez v. AT&T Mobility Services LLC*, 728 F.3d 975, 977 (9th Cir. 2013). "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra*, 775 F.3d at 1199.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Johnson*, 2015 WL 3830291 at *4; see also *Ibarra*, 775 F.3d at 1198. "This burden is not 'daunting' and only requires that the defendant 'provide evidence establishing that it is more likely than not that the amount in controversy exceeds [$5,000,000].'" *Varsam*, 2015 WL 4199287 at *2 (quoting *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1204 (E.D. Cal. Feb.27, 2008)).

"[D]efendants satisfy [the] burden of proof when they 'rel[y] on a reasonable chain of logic' based on the allegations of the complaint, and 'present[ ] sufficient evidence to establish that the amount in controversy exceeds $5 million.'" *Clay v. Chobani LLC*, No. 14cv2258 BEN DBH, 2015 WL 4743891, *4 (S.D. Cal. Aug. 10, 2015) (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015)); see also *Ibarra*, 775 F.3d at 1198 ("Under this system, CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure"); *Vasquez v. Blue Cross of California*, No. CV-15-2055-MWF (AGRx), 2015 WL 2084592, *3 (C.D. Cal. May 5, 2015) (same); *Unutoa*, 2015 WL 898512 at *2 ("a court should deny a motion to remand where a defendant calculates the amount in controversy by relying on the clear allegations of the complaint

regarding the frequency of violation and potential liability calculations supported by real evidence").

"Nevertheless, a court 'cannot base [a finding of] jurisdiction on [a] [d]efendant's speculation and conjecture.'" *Lafountain*, 2015 WL 3948842 at *2 (quoting *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1002 (9th Cir. 2007)).  See also *Ibarra*, 775 F.3d at 1197 ("Under this system, a defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions"); *Sanchez v. The Ritz Carlton*, No. CV15-03484 PSG (PJWx), 2015 WL 4919972, *3 (C.D. Cal. Aug. 17, 2015) ("Plaintiffs are correct that removal calculations based on speculation and unsupported assumptions are insufficient to establish the amount in controversy by a preponderance of the evidence"); *Page v. Luxottica Retail N. Am., Inc.*, No. CV 13-1333 MCE (KJN), 2015 WL 966201, *2-7 (E.D. Cal. Mar. 4, 2015) (finding defendant's assumed violation rate unduly speculative, unsupported by evidence, and inconsistent with allegations in the complaint); *Adams v. Toys 'R' Us-Delaware, Inc.*, No. 14-cv-05550-MEJ, 2015 WL 395214, *2 (N.D. Cal. Jan. 29, 2015) ("Nonetheless, because the standard is preponderance of the evidence, courts cannot base jurisdictional determinations on 'speculative and self-serving assumptions' that are not suggested by the pleadings or supported by evidence," quoting *Garibay v. Archstone Communities LLC*, 539 Fed. Appx. 763, 764 (9th Cir.2013)).  "[W]hen the defendant relies on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million, the chain of reasoning and its underlying assumptions must be reasonable." *LaCross*, 775 F.3d at 1201.

On the other hand, "when a removing defendant makes specific factual allegations establishing jurisdiction and can support them . . . with evidence combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations[,] [t]hat kind of reasoning is not akin to conjecture, speculation, or star gazing." *Ibarra*, 775 F.3d at 1197 (quoting *Pretka v. Kolter City Plaza II, Inc*., 608 F.3d 744, 754, 771-72 (11th Cir. 2010)).  "Defendants need not 'research, state, and prove the plaintiff's claim for damages,' particularly since the question asks only what the plaintiff has 'put in controversy,' not how much the defendant should truly owe." *Adams*, 2015 WL 395214 at *2 (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010), and *Coleman v. Estes Express Lines, Inc.*, 730 F.Supp.2d 1141, 1148 (C.D. Cal. 2010),

1   aff'd, 631 F.3d 1010 (9th Cir. 2011)). See also *Unutoa*, 2015 WL 898512 at *3 ("Removing

2   defendants will inevitably rely on some assumptions to support removal; a removing defendant is

3   not required to go so far as to prove Plaintiff's case for him by proving the actual rates of violation");

4   *Marentes v. Key Energy Servs. California, Inc.*, No. 1:13-CV-02067 AWI, 2015 WL 756516,*9

5   (E.D. Cal. Feb. 23, 2015) ("the measure, for purposes of CAFA, is not what the class members will

6   recover but the amount that has been put in controversy by the complaint.  Because there was no

7   evidence that the maximum penalty would not be awarded, the Court concluded the complaint

8   placed at least $5 million in controversy," citing *Korn*, 536 F.Supp.2d at 1202); *Oda v. Gucci Am.,*

9   *Inc.*, No. CV 14-07469-SVW (JPRx), 2015 WL 93335, *3 (C.D. Cal. Jan. 7, 2015) ("Plaintiffs'

10   argument misunderstands the nature of Gucci's burden at the current stage of litigation: Gucci need

11   only submit sufficient evidence to show that it is more likely than not that there is more than

12   $5,000,000 in controversy.  Gucci need not prove the merits of Plaintiffs' case," citing *Muniz v. Pilot*

13   *Travel Centers LLC*, No. CIV. S-07-0325FCDEFB, 2007 WL 1302504, *5 (E.D. Cal. May 1,

14   2007)); *id.* at *5 ("Gucci is not required to comb through its records to identify and calculate the

15   exact frequency of violations. Rather, Gucci is only required to prove the amount in controversy by

16   a preponderance.  Where, as here, a plaintiff makes generalized allegations regarding the frequency

17   of violations, a defendant may calculate the amount in controversy based on reasonable

18   assumptions").

19       "Notwithstanding these goal posts, significant questions remain unanswered by the appellate

20   courts. . . .  It is . . . unclear what kind of evidence allows a defendant to carry its burden – all that

21   is clear is that such evidence must be sufficient to prove the amount in controversy by a

22   preponderance." *Duberry*, 2015 WL 4575018 at *2.

23       "*Dart Cherokee* and *Ibarra* put all involved on the horns of a dilemma: the questions they

24   raise implicate fundamental tensions and evade easy answers.  On the one hand, these cases require

25   a defendant to do more than pull an assumed rate of violation from the ether of generalized

26   allegations of illegal behavior.  On the other hand, defendants should not be required to fall on their

27   swords to establish the propriety of removal jurisdiction." *Amaya v. Consol. Container Co.*, *LP*, No.

28   CV 15-03369 SVW (PLAx), 2015 WL 4574909, *2 (C.D. Cal. July 28, 2015) (internal citations

omitted).  See also *Sanchez*, 2015 WL 4919972 at *3.

This tension is particularly pronounced when calculation of the amount in controversy requires determining how frequently a liability-creating event occurred.  Courts "have taken inconsistent approaches to judging reasonableness when, as here, the [c]omplaint does not clearly suggest a violation's frequency."  *Sanchez*, 2015 WL 4919972 at *4.  See also *Duberry*, 2015 WL 4575018 at *3 (noting the inconsistent approaches); compare *Johnson*, 2015 WL 3830291 at *6-9 (rejecting a proposed amount in controversy in part because defendant did not submit sufficient evidence of potential liability) with *Mejia*, 2015 WL 2452755 at *3-6 (accepting reasonable assumptions based on the complaint and generalized employment data).

Although "[t]he cases are not perfectly consistent, . . . courts have generally found the amount in controversy satisfied under two circumstances. First, courts are satisfied when defendants essentially confess by submitting calculations derived from actual evidence of potential violations observed in a sample of data, which the defendant then extrapolates to the putative class." *Duberry*, 2015 WL 4575018 at *3. See also, e.g., *Varsam*, 2015 WL 4199287 at *2-3 (accepting defendant's 25% meal break violation rate based on the number of violations observed in eligible shifts worked by putative class members).

Alternatively, a removing defendant may assume a particular violation rate.  Whether this is appropriate "depends on the allegations in the plaintiff's complaint." *Mejia*, 2015 WL 2452755 at *3.  Courts have "generally found the amount in controversy satisfied where a defendant assumes a 100% violation rate based on allegations of a 'uniform' illegal practice (or other similar language) and where the plaintiff offers no evidence rebutting this violation rate." *Duberry*, 2015 WL 4575018 at *3 (citing *Unutoa*, 2015 WL 898512 at *2-3, and *Ibarra*, 775 F.3d at 1199 (an allegation that defendant "universally, on each and every shift" violated the Labor Code would be sufficient to support an assumed 100% violation rate)); *Amaya*, 2015 WL 4574909 at *2.  "[A] 'pattern and practice' of doing something[, by contrast,] does not necessarily mean always doing something." *Ibarra*, 775 F.3d at 1198-99.

How regular a practice must be to support an assumed 100% violation rate is not entirely clear.  Some courts focus on the specific words used in the complaint to describe the frequency of

the practice.  See, e.g., *Sanchez*, 2015 WL 4919972 (finding defendants' assumption that each employee missed one meal and one rest break, and had thirty minutes of unpaid overtime every other week appropriate, given that the complaint alleged defendants had a "policy and/or practice" of understaffing that led to off-the-clock work with no overtime pay, and generally alleged that plaintiffs and other class members were not afforded meal and rest breaks); *Duberry*, 2015 WL 4575018 at *6 ("These allegations of a 'uniform policy,' 'systematic scheme,' and violations occurring at 'all material times' are similar to allegations that other courts have found sufficient to ground an assumed 100% violation rate – even after *Ibarra*"); *Mejia*, 2015 WL 2452755 at *4 ("Unlike in *Ibarra*, Plaintiff does not allege that there was a 'pattern and practice' or that the lead plaintiff experienced violations only on 'multiple' occasions.  Instead, Plaintiff alleges that Defendant 'adopted and maintained uniform policies, practices and procedures' that caused the purported violations of California's rest period law"); but see *Muniz*, 2007 WL 1302504 at *3-5 (finding use of a 100% assumed violation rate proper where plaintiff alleged defendant did "not always" pay the amount of compensation due).

Courts also focus on whether a plaintiff criticizing a defendant's reliance on a 100% violation rate posits or adduces evidence of an alternate rate, either in the complaint or in a motion to remand.  See, e.g., *Sanchez*, 2015 WL 4919972 at *4 ("Here, Defendants offered conservative, plausible violation rates not inconsistent with the allegations in the Complaint.  Plaintiffs do not offer any evidence indicating that lower violation rates were more appropriate. . . . Demanding much more from Defendants would essentially require them to prove the merits of Plaintiffs' case"); *Mejia*, 2015 WL 2452755 at *4 ("Plaintiff's FAC does not contain any allegations that suggest a 100% violation rate is an impermissible assumption. . . .  It is not unreasonable to assume that when a company has unlawful policies and they are uniformly 'adopted and maintained,' then the company may potentially violate the law in each and every situation where those policies are applied"); *Lopez v. Aerotek, Inc.*, No. SACV 14-00803-CJC (JCGx), 2015 WL 2342558, *3 (C.D. Cal. May 14, 2015) ("However, although afforded the opportunity to do so on this motion, Plaintiff does not assert or suggest an alternative violation rate on which the Court should rely.  Aerotek properly used a chain of reasoning based on the Complaint to conclude that the amount-in-controversy requirement is met

1  in this case.  The Court is persuaded that Aerotek could have logically assumed a 100 percent

2  violation rate because Plaintiff does not qualify her allegations to be on behalf of anything less than

3  all the employees, so long as their claims are within the 'applicable statute of limitations'"); *Unutoa*,

4  2015 WL 898512 at *3 ("Notably, Plaintiff fails to assert any different rate of violation or to submit

5  any evidence indicating a contrary rate of violation.  Plaintiff does not even submit his own

6  declaration stating that he experienced less frequent rates of violation than those asserted by

7  Defendants").

8      Other courts, however, have required that defendants adduce some evidence of the actual

9  violation rate.  See, e.g., *Townsend*, 2015 WL 3970172 at *5 ("Brinderson's contention regarding

10  the amount in controversy on this claim relies on the unsupported assumption that there was a

11  violation for each class member for each day he or she worked long enough to be entitled to a meal

12  period, i.e. that there was a 100% violation rate.  '[C]ourts disavow the use of a 100% violation rate

13  when calculating the amount in controversy absent evidentiary support,'" quoting *Moreno v. Ignite

14  Restaurant Group*, No. C 13-05091 SI, 2014 WL 1154063, *5 (N.D. Cal. Mar. 20, 2014)); *Moreno*,

15  2014 WL 1154063 at *5 (failing to provide "any support of a 100 percent violation rate, such as

16  evidence based on . . . records or a random sampling . . . is not sufficient to establish the amount in

17  controversy by a preponderance of the evidence").

18      "What remains unclear is how to resolve cases . . . involving generalized allegations

19      of an illegal 'pattern and practice' used to support an assumed violation rate less than

20      100%[,] or cases involving competing evidence offered by both parties of different

21      types and degrees of persuasiveness.  The cases venturing into this murky area are not

22      all of one mind.  Compare *Johnson*, 2015 WL 3830291 at *6 (rejecting amount in

23      controversy calculations, in part, because the defendant failed to submit evidence

24      essentially confessing liability)[ ] with *Tajonar v. Echosphere*, *L.L.C.*, No.

25      14CV2732-LAB RBB, 2015 WL 4064642, *3-5 (S.D. Cal. July 2, 2015) (accepting

26      reasonable assumptions based on the complaint and generalized employment data and

27      stating that a defendant 'is not required to comb through its records to identify and

28      calculate the exact frequency of violations,' quoting *Oda*, 2015 WL 93335 at *5), and

16

1    *Mejia*, 2015 WL 2452755[ ] at *3-6 . . . (accepting reasonable assumptions based on

2    the complaint and generalized employment data).  The life of this law will be

3    experience, not logic – in the meantime, these in-between cases will turn on context

4    and fact-specific considerations." *Duberry*, 2015 WL 4575018 at *3.

5    In navigating these murky waters, courts are generally more willing to credit assumptions

6    despite gaps in the supporting evidence if there is some "wiggle room," i.e., where full accuracy is

7    not required to ensure that the $5,000,000 amount in controversy requirement has been met.  For

8    example, courts have been willing to credit the defendant's assertion that there was a 100% violation

9    rate if the calculated amount in controversy is significantly higher than $5,000,000, or if a 100%

10    frequency rate is assumed for some, but not all, violations.  See, e.g., *Mejia*, 2015 WL 2452755 at

11    *4 n. 3 ("Defendant's calculation possibly could have been more precise.  It is unclear from the

12    declarations submitted whether Defendant took into account the fact that employees who worked

13    less than three-and-half hours in a day would not be entitled to a rest period break.  But unless a very

14    significant number of the 314,013 work days were that short, the amount in controversy in this case

15    would still exceed the jurisdictional threshold when one takes into account the amount in

16    controversy from the two other claims for which Defendant has submitted evidence"); *Townsend*,

17    2015 WL 3970172 at *6 ("The court notes that even in *Unutoa*, a case upon which Brinderson relies,

18    the defendants did not rely on a 100 percent violation rate for most claims," citing *Unutoa*, 2015 WL

19    898512 at *3 (noting that defendants assumed class members "missed one required meal period per

20    week" and "missed one required rest period per week")).

21    Because Republic's calculation results in an amount in controversy of only $6,111,200.25,

22    including attorneys' fees, the court must require somewhat more evidentiary support for the

23    assumption of a 100% violation rate than might otherwise be the case.  Compare *Mejia*, 2015 WL

24    2452755 at *6 (alleging that there was $9,425,514 in controversy).

25    **a.    Frequency of Alleged Meal and Rest Break Violations**

26    California Labor Code § 226.7(b) states that "[a]n employer shall not require an employee

27    to work during a meal or rest or recovery period."  Blevins alleges:

28    "As a pattern and practice Defendants did not provide employees with meal periods

17

and rest breaks and did not provide proper compensation for this failure.  Further, upon information and belief, Defendants regularly deducted a meal period from employees' hours worked, despite employees working and not taking a duty-free meal period.  Further, upon information and belief, Defendants failed to accurately record meal breaks.  Plaintiff and other employees, even when provided with meal and rest periods, would be rushed, pressed to cut-short or interrupted and was not paid the proper meal and rest break premiums for these violations."[26]

Republic's notice of removal estimates that the amount in controversy on this claim is $1,815,271.20.[27]  Noting that the complaint does not indicate the number of violations, Republic asserts that it used, as a conservative estimate, one meal period violation per week (1 hour x $21.30/hour x 212 work weeks during limitations period x 201 putative class members = $907,635.60).  It similarly used as an estimate one rest period violation per week (same calculation = $907,635.60), for a combined total of $1,815,271.20.

One violation per week is a reasonable assumption based on Blevins' allegation that Republic had "a pattern and practice" of denying meal and rest periods.  This is particularly true as Blevins does not provide an alternate estimate.  See *Oda*, 2015 WL 93335 at *4 (approving use of an assumed 50% violation rate, e.g., 2.5 meal period violations in a 5-day work week, based on allegations that defendant "maintained a policy or practice of not paying additional compensation to employees for missed, [ ]interrupted, and/or [un]timely meal and/or rest periods"); *Unutoa*, 2015 WL 898512 at *3 (finding an assumption of one missed meal period per week, for each of 40 weeks of a 52 week year reasonable where plaintiff alleged that defendants "often" held events at which he and class members were required to work shifts of as much as twelve hours without taking a meal period; that there was no written policy informing plaintiffs they were permitted to take a second meal period during shifts of more than ten hours; that class members were required to remain on-call during meal periods to respond to emergencies; and that they "regularly" performed work during

_____

[26]Complaint, ¶ 36.

[27]Notice of Removal at 7.

their meal periods); *id*. ("While Defendants' calculation of the amount in controversy relies on assumed rates of violation, these rates are sufficiently supported by Unutoa's allegations and Defendants' evidence"); *Lopez*, 2015 WL 2342558 at *2 (approving use of a 100% violation rate based on an allegation that "Defendants employed their workers for work periods of more than five hours without a meal period of not less than 30 minutes and failed to compensate them for such meal periods, as required by Code Section 226.7 and the Wage Order"). Cf. *Townsend*, 2015 WL 3970172 at *6 ("Brinderson's reliance on plaintiff's allegation regarding the existence of a policy that does not include provisions requiring meal breaks at certain periods, does not support its 100 percent violation rate assumption. As an initial matter, plaintiff's Complaint does not state that all non-exempt employees were never provided a meal or rest break on every shift. Instead, plaintiff's Complaint alleges that the claims arise from defendant's unlawful 'policy or practice'"); see also *Ibarra*, 775 F.3d at 1199 ("While it is true that the complaint alleges that Manheim maintains 'an institutionalized unwritten policy that mandates' the employment violations alleged in the complaint, including the denial of meal and rest periods, this does not mean that such violations occurred in each and every shift").

While the court accepts Republic's assumption regarding the violation rate with respect to meal periods and rest breaks, as detailed below, certain other aspects of its amount in controversy calculation on the meal period/rest break claims are fatally problematic**.**

### b.    Frequency of Alleged Overtime Violations

Blevins asserts that "as a pattern and practice, [d]efendant[ ] regularly miscalculated overtime compensation by failing to pay daily overtime after eight hours per day."[28]  He also alleges that "[d]efendant failed to provide any compensation for the time [p]laintiff and the [c]lass [m]embers spent . . . performing job duties prior to the start of their respective shifts," and that it "failed to properly compensate for travel time at the appropriate hourly rates and . . . compensated for travel time at [a] straight-time rate only[,] failing to account for the daily and weekly hours."[29]

---

[28]Complaint, ¶ 42.

[29]*Id.*, ¶ 43.

Republic's notice of removal estimates that the amount in controversy on this claim is $2,269,089.00.[30]  Noting that neither the complaint nor the motion to remand offers an alternate estimation of frequency, Republic assumes that each putative class member worked 1 hour of unpaid overtime in each week of the class period (1 hour/week x $21.30/hour x 1.5 overtime premium x 212 weeks x 201 putative class members = $1,361,453.40); and that one hour per week during the class period was paid at straight time rather than an overtime rate (1 hour/week x $10.65/hour ($31.95 - $21.30) x 212 weeks x 201 putative class members = $453,817.80).  Republic also includes in its calculation one improperly deducted 30-minute meal period per week for each week of the class period ($21.30/hour x .5 hours x 212 work weeks x 201 putative class members = $453,817.80).  This amount duplicates the class' potential recovery on the alleged meal period violations.  Because class members cannot recover twice for a missed meal period, the court declines to include this amount in evaluating the amount in controversy on the overtime claim.  When this amount is removed, Republic's estimate of the amount in controversy on the overtime claim is $1,815,271.20.

Republic's violation rate assumptions with respect to the overtime claim are in line with those accepted by other courts.  See *Oda*, 2015 WL 93335 at *3 (accepting an assumption that there was one violation equal to one hour per week based on allegations that defendant "sometimes" failed to pay overtime).  As discussed *infra*, however, other assumptions underlying the calculation are speculative and unreliable, and do not support inclusion of this figure in the amount in controversy calculation.

---

[30]Notice of Removal at 8-9.

1       **2.       Unsupported Assumptions Underlying Meal, Rest Break, and Overtime**

2                  **Violations**

3       While, as noted, the court does not disagree with Republic's assumptions concerning the

4 frequency of violations, it concludes that Republic has nonetheless failed to demonstrate that more

5 than $5,000,000 is in controversy on Blevins' claims.  With respect to its calculations concerning

6 the amount in controversy on the alleged meal period, rest break, and overtime violations, Republic

7 fails to account for the fact that some employees worked for less than the entire class period.[31]  The

8 named plaintiff is perhaps the most obvious example of this, as he worked for the company for only

9 18 days.[32]  Second, Republic does not proffer evidence that all class members worked full time rather

10 than part-time.  As a result, there is no logical or evidentiary support for Republic's assumption that

11 all 201 class members worked full time for the entire class period.  Certainly, no allegations in the

12 complaint support or give rise to such an inference.  To do a credible job of estimating class

13 damages, Republic should, at a minimum, have disclosed what percentage of its employees worked

14 full time rather than part-time during the class period.  It should also have determined how many

15 employees resigned or were terminated during the class period.  While this information would not

16 have produced an exact estimate of the amount in controversy, it would have yielded a number that

17 was substantially more reliable than the number based on Republic's assumption that all 201 class

18 members worked full time for the entire four-year period.  See *Amaya*, 2015 WL 4574909 at *3

19 _____

20      [31]Blevins also argues that Republic fails to account for sick, vacation, and other leaves of

21 absence.  See *Deaver v. BBVA Compass Consulting & Benefits, Inc.*, No. 13-cv-00222-JSC, 2014
WL 2199645, *5 (N.D. Cal. May 27, 2014) ("In other words, [d]efendants' calculation assumes

22 every class member worked every week of their employment – an assumption belied by common
sense").  He also disputes Republic's use of an average hourly wage, rather than individual

23 employees' rates.  See *Weston v. Helmerich & Payne Int'l Drilling Co.*, No. 1:13-cv-01092-LJO,

24 2013 WL 5274283, *5 (E.D. Cal. Sept. 16, 2013) (concluding "that using an average merely ensured
that the calculations are inaccurate for virtually every employee.  It is unclear why the actual figures

25 could not have been used and damage estimates still achieved expeditiously given the employee's

26 unique information").  But see *Ibarra*, 775 F.3d at 1198 (relying on an average hourly wage of
$11.66).  Given the other problems with Republic's calculations, however, the court need not

27 address these issues.

28      [32]Complaint, ¶ 9.

1  ("Amaya argues that CCC fails to adequately support its assumed rate of one hour of unpaid

2  overtime per week across the entire proposed class. CCC bases its calculation on the number of

3  work weeks worked during the relevant time period. While CCC is correct that Amaya's allegation

4  of a 'uniform policy/practice' is sufficient to ground an assumed 100% violation rate, CCC

5  erroneously applies this rate to the total number of weeks worked. CCC fails to establish that these

6  weeks were all workweeks in which that particular employee could be entitled to overtime

7  compensation. . . . Though [a generalized statement that class members were required to work more

8  than eight hours a day and/or forty hours per week] alleges that CCC failed to pay overtime for all

9  hours worked 'at all material times,' this allegation only shows that whenever the class members

10  worked overtime they were not properly compensated. It says nothing of the frequency with which

11  class members worked weeks or shifts of sufficient duration that they might have been entitled to

12  work overtime").

13          **3.     Amount in Controversy on Alleged Failure to Provide Accurate Wage**

14                   **Statement Claims**

15          "Cal[ifornia] Labor Code § 226(a) requires employers, in part, to provide each employee with

16  'an accurate itemized [wage] statement in writing.' Employers violating § 226(a) are penalized, and

17  employees may receive 'the greater of all actual damages or fifty dollars ($50) for the initial pay

18  period in which a violation occurs and one hundred dollars ($100) per employee for each violation

19  in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000).'

20  A one-year statute of limitations applies." *Tajonar*, 2015 WL 4064642 at *5 (citing CAL. LAB. CODE

21  § 226(e)(1); CAL. CODE CIV. PROC. § 340).

22          Blevins alleges that "[d]efendants failed in their affirmative obligation to keep accurate

23  records regarding the rates of pay for their California employees."[33] In the notice of removal,

24  defendants assert there is $804,000 in controversy on the wage statement claim.[34] This figure is

25  based on an estimate that there was one violation per week, and thus that every class member would

26  _____

27          [33]Complaint, ¶ 52.

28          [34]Notice of Removal at 10.

be entitled to recover the statutory maximum penalty of $4,000 ($4,000 x 201 = $804,000).

Blevins argues that Republic erroneously assumes that every class member will be entitled to recover the statutory maximum penalty, and the court agrees. Some courts have found an assumption that each class member would be entitled to maximum penalties reasonable. *Tajonar*, 2015 WL 4064642 at *5 (finding such an assumption reasonable "especially in light of the fact that the complaint suggests that DISH uniformly issued inaccurate pay stubs to nonexempt employees"); *Mejia*, 2015 WL 2452755 at *5 ("It is not unreasonable to assume that, with this many violations alleged, every one of the wage statements issued during the class period could potentially have been noncompliant. In addition, and aside from the various allegations, if Defendant had a uniform policy of failing to provide rest periods, as discussed above, the wage statements that Defendant provided would necessarily have been inaccurate 100% of the time because each wage statement would have failed to include compensation for the missed rest break").

Republic fails to consider or address a number of factors that contradict its assumption that each class member would be able to recover maximum wage statement penalties, however. First, despite the fact that the cause of action is governed by a one-year statute of limitations, Republic calculates penalties for all 201 class members; this is the number of class members over a four-year class period, as that is the longest statute of limitations governing Blevins' claims. Republic does not state what percentage of the 201 individuals purportedly in the class worked for it during the year preceding the filing of the complaint. See *Oda*, 2015 WL 93335 at *4 (assuming each class member was entitled to receive $4,000, but limiting the calculation to the year preceding the filing of the complaint). Additionally, as discussed *infra*, Republic does not account for class members – like Blevins – who did not work for defendants for a sufficiently long period of time to accrue the maximum number of violations.

For these reasons, Republic has failed to meet its burden of showing by a preponderance of the evidence that there is $804,000 in controversy on the wage statement claim. Republic's failure to establish the amount in controversy on this claim is significant. If the number Republic assigns as the amount in controversy on the wage statement claim is removed from its calculation, the

remaining amounts it calculates, even accepted as reliable estimates, do not equal $5,000,000.[35]
Standing alone, therefore, its failure to use the correct class period in calculating the amount in
controversy on the wage statement claim defeats its assertion that the court has jurisdiction under
CAFA.

### e.      Attorneys' Fees

Republic argues that a 25% attorneys' fee award can be aggregated with the amount in
controversy it has calculated on Blevins' claims.  Attorneys' fees are properly included in a
calculation of the amount in controversy for diversity jurisdiction purposes.  See *Yocupicio v. PAE
Group, LLC*, No. 14-8958-GW, 2014 WL 7405445, *6 (C.D. Cal. Dec. 29, 2014) ("The Court would
thus include a 25% fee award in its amount-in-controversy calculation" in a wage and hour class
action), rev'd on other grounds, 795 F.3d 1057 (9th Cir. 2015); *Galt v. Scandinavia*, 142 F.3d 1150,
1156 (9th Cir. 1998) ("We hold that where an underlying statute authorizes an award of attorneys'
fees, either with mandatory or discretionary language, such fees may be included in the amount in
controversy"); see also *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ("This circuit
has established 25% of the common fund as a benchmark award for attorney fees").  Republic
estimates attorneys' fees of $1,222,240.05, or 25 percent of the aggregate amount it contends is in
controversy on Blevins' claims – $4,888,960.20.[36]

The court cannot find this fee estimate reasonable, however, because it is based on an amount
in controversy on Blevins' various claims that Republic has failed to support by a preponderance
of the evidence.  As noted, Republic's estimates of the amount in controversy on the meal period/rest
break, overtime and wage statement claims are not reliable because Republic failed to determine
how many of the 201 individuals who worked for it at some point during the four years preceding
the filing of this lawsuit were employed for the entire four years, and how many were employed for

---

[35]When Republic's calculation of the amount in controversy on the wage statement claim is
disregarded, the alleged amount in controversy is, according to its numbers, $4,538,178.00
(($1,815,271.20 on the meal and break period violations+$1,815,271.20 on the overtime violations)
+ 25% attorneys' fees ($907,635.60)).

[36]Opposition at 5.

only a portion of that time.  It has also failed to provide information as to how many of the 201 individuals were employed full time as opposed to part-time.  Finally, it has used a four-year class period in calculating wage statement penalties when that claim is subject to a one-year statute of limitations.  Because its estimate of fees is based on its estimate of the amount in controversy on Blevin's substantive claims, and because that estimate is based on unfounded assumptions and does not satisfy Republic's burden of proof, its fee estimate is inflated.  See *Wastier*, 2007 WL 4277552 at *3 ("Further, even assuming that the correct approach is to include a reasonable estimate of fees likely to be recovered, [d]efendants' calculations are speculative, lack evidentiary support, and are conclusory at best").

Courts in the Ninth Circuit, moreover, are split as to whether only attorneys' fees that have accrued at the time of removal should be considered in calculating the amount in controversy, or whether the calculation should take into account fees likely to accrue over the life of the case. Compare *Brady v. Mercedes-Benz USA, Inc.*, 243 F.Supp.2d 1004, 1011 n. 4 (N.D. Cal. 2002) ("While an estimate of the amount in controversy must be made based on facts known at the time of removal, that does not imply that items such as future income loss, damages, or attorneys fees likely to be incurred cannot be estimated at the time of removal"); *Simmons v. PCR Tech.*, 209 F.Supp.2d 1029, 1034-35 (N.D. Cal. 2002) ("Such fees necessarily accrue until the action is resolved.  Thus, the Ninth Circuit must have anticipated that district courts would project fees beyond removal") with *Dukes v. Twin City Fire Ins. Co.*, No. CV-09-2197-PHX-NVW, 2010 WL 94109, *2 (D. Ariz. Jan. 6, 2010) ("This Court concludes that the better view is that attorneys' fees incurred after the date of removal are not properly included because the amount in controversy is to be determined as of the date of removal.  Future attorneys' fees are entirely speculative, may be avoided, and are therefore not 'in controversy' at the time of removal"); *Green v. Party City Corp.*, No. CV-01-09681 CAS (Ex), 2002 WL 553219, *2 & n. 3 (C.D. Cal. Apr. 9, 2002) (calculating attorneys' fees on the basis "only [of] work done by plaintiff's counsel prior to removal"); *Faulkner v. Astro-Med, Inc.*, No. C 99-2562 SI, 1999 WL 820198, *4 (N.D. Cal. Oct. 4, 1999) ("When estimating attorney's fees for the purposes of establishing jurisdiction, the only fees that can be considered are those incurred as of the date of removal," citing *Miranti v. Lee*, 3 F.3d 925, 928 (5th

Cir. 1993)); *Conrad Associates v. Hartford Accident & Indemnity Co.*, 994 F.Supp. 1196, 1200 (N.D. Cal. 1998) (declining to consider post-removal events in calculating attorneys' fees for purposes of assessing removal jurisdiction).  See also *Giordano v. Park Avenue Life Insurance Co.*, No. CV 09-01405 SJO (FMOx), 2009 WL 1474945, *3 (C.D. Cal. Apr. 7, 2009) ("Where attorneys' fees are to be included in the amount in controversy, 'district courts in this circuit have disagreed [as to] whether attorneys' fees incurred after the date of removal are properly included in the amount in controversy:' some courts refuse to consider attorneys' fees incurred after removal whereas others include a 'reasonable estimate of attorneys['] fees likely to be expended,'" quoting *Burk v. Medical Savings Insurance Co.*, 348 F.Supp.2d 1063, 1068-69 (D. Ariz. 2004) (alterations original)); *Wastier v. Schwan's Consumer Brands*, No. 07CV1594, 2007 WL 4277552, *3 (S.D. Cal. Dec. 5, 2007) ("Defendants' estimate of [p]laintiffs' fees for activities anticipated but not yet performed, even if accurate, may be irrelevant").

Republic has proffered no evidence establishing or even estimating the amount of attorneys' fees the putative class had incurred as of the date of removal.  If only fees incurred prior to removal can be included in the amount in controversy, therefore, it has failed to establish by a preponderance of the evidence the amount of attorneys' fees that should be included in the amount in controversy. And, as noted, even when the court considers fees likely to be incurred during the course of the litigation, it must still conclude that Republic had failed to establish by a preponderance of the evidence the amount of attorneys' fees at issue.

For all of these reasons, the court cannot find that Republic has met its burden of proving the amount of attorneys' fees at issue by a preponderance of the evidence.  Absent the inclusion of attorneys' fees, Republic's alleged $4,888,960.20 is below the requisite $5,000,000 in controversy, and the case must be remanded.

1          **f.      Conclusion Regarding Republic's Estimate of the Amount in**
2                   **Controversy**

3          For all the reasons stated above, Republic has not shown by a preponderance of the evidence

4   that the amount in controversy exceeds $5,000,000.  As detailed, Republic's assumption that each

5   of the 201 class members worked for it full time throughout the entire four-year class period makes

6   its calculations of the amount in controversy on the meal period/rest break and overtime claims

7   unreliable.  Even if the court were to accept these calculations, however, and its assumption that

8   attorneys' fees will equal 25% of the damages and penalties recovered, it would still be unable to

9   accept Republic's calculation of the amount in controversy on the wage statement claim because it

10  is based on a four-year rather than a one-year class period.  As a consequence, this aspect of

11  Republic's calculations must be disregarded.  When the amount calculated on the wage statement

12  claim is removed, Republic's estimates – even if all other assumptions are accepted – total only

13  $4,538,178.00 (($1,815,271.20 for meal and break period violations+$1,815,271.20 for overtime

14  violations) + 25% attorneys' fees ($907,635.60)).  The court, therefore, cannot find that the amount

15  in controversy exceeds $5,000,000.

16         **2.      Whether Republic Has Satisfied Its Burden By Multiplying the $25,000**
17                  **Amount Listed in the Complaint by the Number of Class Members**

18         Alternately, Republic asserts that because the complaint states that the monetary damages

19  Blevins seeks are in excess of the jurisdictional limits of the Superior Court (i.e., $25,000),[37] because

20  Blevins alleges that his claims are typical of those of other class members, and because "the

21  [c]omplaint provides absolutely no details regarding the amounts of alleged unpaid overtime,

22  off-the-clock-work or business expenses, [it] plausibly may assume that [p]laintiff's individual

23  claims are worth no less than $25,000 and that the claims of putative class members (of which there

24  are 201) are valued at the same amount per putative class member."  Utilizing these assumptions,

25  it calculates an amount in controversy of $5,025,000.[38]  Republic argues that its assumption is

26  _____

27         [37]Complaint, ¶ 4.

28         [38]Notice of Removal at 11.

plausible because the $25,000 figure would equal 3.76 hours of unpaid overtime during a workweek ($25,000/4 years/52 workweeks per year x an overtime rate of $31.95 = 3.76 unpaid overtime hours per week).[39]

As a preliminary matter, this calculation suffers from some of the same unfounded assumptions the court discussed earlier.  It assumes, for example, that all class members worked every week of the four-year class period, and did not receive overtime to which they were entitled every week.  This fails to take into account any vacation time employees were entitled to take; during vacation days, employees would presumably have been paid non-overtime wages, but would not have accrued overtime compensation.  The calculation also assumes that employees received *no* wages at all for the 3.76 hours of alleged overtime per week, i.e., that they were not only not paid overtime wages, but were not paid at the regular wage rate for these hours as well.  This is contrary to the allegations in the complaint.[40]

Blevins, moreover, clarifies that the $25,000 allegation to which Republic refers concerns the amount in controversy for the whole class.[41]  This clarification is supported by the fact that Blevins' individual claims could not have resulted in a $25,000 claim.  Blevins alleges that he worked for Republic "from December 26, 2014 to January 13, 2015,"[42] or a total of 18 days.  Even if he worked 24 hours a day for the entire 18 days, Blevins would only have earned $9,201.60 (18 days x 24 hours/day x $21.30/hour).[43]  Compare *Adams*, 2015 WL 395214 at *4 (concluding that more than $5,000,000 was in controversy where the complaint specifically alleged that the named

---

[39]*Id.* at 12.

[40]Complaint, ¶¶ 42-43.

[41]Motion at 14.

[42]Complaint, ¶ 9.

[43]Reply at 7-8.  Even if Belvins were entitled to be paid overtime for all 24 hours, his claims would only place $13,802.40 in controversy ($9,201.60 x 1.5 =$13,802.40.  The assumption of a 24 hour workday appears more than adequate to subsume any meal period and rest break claims he might have as well.  Finally as Blevins worked at most for two pay periods, his total recovery on the wage statement claim would be $150 – $50 for the first violation and $100 for the second.

plaintiff's individual claim exceeded \$25,000 and the class had 2,000 members).[44]

The court therefore agrees with Blevins that Republic has not demonstrated that the amount in controversy exceeds \$5,000,000 by a preponderance of the evidence under either of its alternate methods of calculation.

### III. CONCLUSION

For the reasons stated, the court concludes that it lacks jurisdiction under CAFA and grants Blevin's motion to remand. It directs the clerk to remand the action to Los Angeles Superior Court forthwith.

DATED: September 28, 2015



MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[44]Neither the notice of removal, nor the parties' briefs address the amount in controversy on Blevins's waiting time penalties and business expenses claim. As a result, the court cannot take them into account in assessing whether the amount in controversy requirement is met. Although Republic included PAGA penalties in its calculation of the amount in controversy included in its notice of removal, the court cannot take those penalties into account in assessing the amount in controversy under CAFA following *Yocupicio v. PAE Group, LLC*, 795 F.3d 1057 (9th Cir. 2015). There, the Ninth Circuit held that PAGA penalties cannot be aggregated with class claims to satisfy CAFA's amount in controversy requirement. *Id.* at 1062. Republic concedes this point in its opposition. (Opposition at 4 n. 4).